**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| CATHERINE A. TOWNSEND, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-516-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Catherine A. Townsend on December 12, 2012, and a Plaintiff's Brief in Support of her Motion to Reverse the Decision of the Commissioner of Social Security [DE 16], filed on June 18, 2013. Plaintiff requests that the June 23, 2011 decision of the Administrative Law Judge denying her claims for disability insurance benefits be reversed for an award of benefits or remanded for further proceedings. On September 26, 2013, the Commissioner filed a response, and Plaintiff filed a reply on October 10, 2013. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On August 20, 2009, Plaintiff filed an application for disability insurance benefits, alleging an onset date of September 13, 2009. The application was denied initially on December 8, 2009, and upon reconsideration on March 17, 2010. Plaintiff timely requested a hearing, which was held on May 6, 2011, before Administrative Law Judge ("ALJ") Michael Hellman. In appearance were Plaintiff, her attorney Thomas J. Scully III, and vocational expert Pamela Tucker. The ALJ issued a written decision denying benefits on June 23, 2011, making the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.	The claimant has not engaged in substantial gainful activity since September 13, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.	The claimant has the following severe impairments: systemic lupus erythematosus, rheumatoid arthritis, obesity, nephritis, and bilateral carpal tunnel syndrome (20 CFR 404.1520(c)). Hypertension, lipid metabolism disorder, and lymph node situation are not severe impairments within the meaning of the Social Security Act.

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.	After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she must avoid moderate exposure to extreme cold, concentrated exposure to extreme heat, and concentrated exposure to high humidity.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.	The claimant was born [in 1960] and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 13, 2009, through the date of this decision (20 CFR § 404.1520(g)).

(AR 23-31).

On October 16, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On December 12, 2012, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

Plaintiff was born in 1960 and was 50 years-old on the date that the ALJ issued his decision. At approximately the time of the hearing, Plaintiff's height was five-feet, four-inches, and she weighed as much as 222 pounds.

On April 1, 2009, Plaintiff presented at the office of her family doctor, Dr. A. Tallamraju, M.D., with tingling, numbness, pain, and stiffness in the wrists bilaterally; swelling of the hands with pain bilaterally; and a rash on the face that spread behind the ears. Dr. Tallamraju ordered a battery of tests, including a blood workup, X-rays of the wrists, and an EMG of the upper extremities. Results of the blood test were suggestive of systemic lupus erythematosus ("lupus"). The EMG revealed significant delay in the right and left median conduction velocities, an absence

of the left median sensory palmar response, increased right median ulnar palmar difference, significant delay in the left motor distal latency, and chronic denervation changes in bilateral abductor pollicis brevis muscles. These findings were consistent with left severe median mononeuropathy across the wrist and right moderate to severe median mononeuropathy across the wrist.

Dr. Tallamraju referred Plaintiff to rheumatologist Dr. Anita Zachariah, M.D., who examined Plaintiff on May 7, 2009, and observed swelling in Plaintiff's hand, right wrist, and proximal interphalangeal ("PIP") joints. Plaintiff reported feeling fatigued. Plaintiff reported bilateral shoulder, knee, and wrist pain as well as joint swelling. Dr. Zachariah observed normal bilateral upper extremities except that Plaintiff's hand was swollen. Dr. Zachariah prescribed Prednisone and Plaquenil.

On May 20, 2009, Dr. Zachariah diagnosed rheumatoid arthritis with synovitis. Dr. Zachariah noted that Plaintiff did not complain of fatigue. Her elbow and wrist joints were normal to inspection and palpation, and she had full range of motion and normal stability; however, her hand was swollen and she had PIPs with synovitis in both hands.

On June 17, 2009, Plaintiff saw Dr. Zachariah. Plaintiff had no complaints of fatigue. Dr. Zachariah noted that Plaintiff's hand was swollen, her elbow joint and wrist were normal to inspection and palpation, she had full range of motion and normal stability, but she had PIPs with synovitis in both hands.

At a July 2, 2009 visit to Dr. Zachariah, Plaintiff reported feeling fatigued. Dr. Zachariah noted elbow joint and hand swelling. The wrist was normal, and Plaintiff had full range of motion and normal stability. Plaintiff had PIPs with synovitis in both hands and pain in her knees. Dr.

Zachariah continued Plaquenil and prescribed a course of Prednisone, recommending that Plaintiff consider rituximab at a later date if she was not improving.

On August 10, 2009, Plaintiff reported to Dr. Zachariah that she felt fatigued. She had no swelling in her upper extremities and had full range of motion and normal stability. Dr. Zachariah noted that the PIPs with synovitis in both hands were "markedly improved." Plaintiff's ankles were diffusely swollen.

At the October 6, 2009 visit to Dr. Zachariah, Plaintiff reported no fatigue, and Dr. Zachariah found no swelling of the elbow joint, wrist, or hand. PIPs with synovitis were noted in the 3rd and 4th right PIP, but were improving. There was no diffuse ankle swelling.

On November 4, 2009, Plaintiff saw Dr. Tallamraju for her hypercholesterolemia, hypertension, and medication refills. On the visit report, Dr. Tallamraju noted that Plaintiff suffers from lupus, that she was under the care of a rheumatologist, and that she denied any symptoms of lupus.

On November 13, 2009, Dr. Kanayo K. Odeluga performed a consultative examination of Plaintiff. Plaintiff complained of stiffness, swelling, and pain in her joints, especially joints of the knee and hand. She stated that the pain was worse at night and when standing. Plaintiff described the pain as aching, intermittent, and moderate in intensity. She told Dr. Odeluga that she has difficulty walking and climbing stairs. She obtains relief with the medication prescribed by her doctors. Dr. Odeluga's impressions were psoriatic arthritis, lupus, hypertension, bilateral carpal tunnel, and obesity. Dr. Odeluga found that Plaintiff had normal muscle tone and power on upper and lower limbs and trunk as well as normal grip strength and fine finger manipulation, including the ability to zip, button up, and pick up coins. Dr. Odeluga found that Plaintiff had no difficulty in

performing getting on and off the exam table, tandem walking, walking on toes, walking on heels, and hopping and that she had mild difficulty squatting.

On December 7, 2009, Dr. J. Sands completed a physical residual functional capacity assessment, listing the primary diagnosis as "lupus/ra/CTS bil/obesity." (AR 357). Dr. Sands gave Plaintiff an RFC for medium exertional work, finding that she could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk 6 hours in an 8-hour work day, sit for a total of 6 hours in an 8-hour workday, and had the unlimited ability to push and/or pull. Dr. Sands based the opinion on the April 1, 2009 negative bilateral hand x-ray, the May 7, 2009 negative bilateral wrist x-ray, the April 24, 2009 abnormal bilateral hand EMG suggestive of left severe median mononeuropathy and right moderate to severe median mononeuropathy that showed bilateral carpal tunnel syndrome, and the October 14, 2009 range of motion that was within normal limits. Dr. Sands also cited Dr. Odeluga's November 13, 2009 finding of full range of motion that included the hands and wrists, normal sensation, no anatomic deformity, normal gait, 5/5 strength of all joints, negative straight leg raises, and normal fine finger manipulation. Dr. Sands found Plaintiff partially credible because her allegations were not consistent with the medical evidence of record.

Dr. Zachariah prescribed the anti-inflammatory medication methotrexate. On December 16, 2009, Plaintiff reported "doing better" with less pain and stiffness. Plaintiff felt the methotrexate was helping with the swelling but that she still experienced occasional joint stiffness. Plaintiff had no complaints of fatigue.

At that visit, Dr. Zachariah noted that blood test results in December 2009 were very high for inflammation. Blood test results continued to be "highly abnormal" through January 7, 2010. Dr.

Zachariah referred Plaintiff to a nephrologist who diagnosed class III focal sclerosing glomerulonephritis consistent with lupus nephritis after performing a kidney biopsy.

On January 19, 2010, Plaintiff was diagnosed with an enlarged right axilla lymph node.

In March 2010, Dr. Zachariah decreased the dosage of methotrexate after blood test results continued to be abnormally high.

On March 16, 2010, Dr. B. Whitley reviewed all the evidence in the file and affirmed Dr. Sands' assessment as written.

At a May 4, 2010 visit, Plaintiff had no complaint of fatigue, no elbow swelling, and full range of motion and normal stability. However, Dr. Zachariah noted swelling of the wrist and hand as well as synovitis of the PIP joints.

At a May 18, 2010 visit, Plaintiff had no complaint of fatigue. Dr. Zachariah noted no swelling of the elbow joint, wrist, or hand and that Plaintiff had full range of motion with normal stability. Dr. Zachariah noted that Plaintiff's synovitis had improved.

On May 20, 2010, Dr. Zachariah prescribed rituximab, another anti-inflammatory medication.

On June 23, 2010, Plaintiff had no complaint of fatigue. Dr. Zachariah observed no swelling of the elbow joint, wrist, or hand and noted that Plaintiff had full range of motion and normal stability in the upper extremities. Dr. Zachariah noted that Plaintiff's synovitis improved.

On July 21, 2010, Plaintiff had no complaint of fatigue but reported joint stiffness for 5 minutes. Dr. Zachariah observed no swelling of the elbow joint, wrist, or hand and noted that Plaintiff had full range of motion and normal stability in the upper extremities. Dr. Zachariah again

noted that Plaintiff's synovitis had improved, but noted slight synovitis in the third PIP in both hands.

On November 9, 2010, Dr. Zachariah examined Plaintiff and noted continued synovitis in the third and fourth right PIP. The visit report notes that Plaintiff "states she is feeling fine." Plaintiff reported no fatigue or joint pain.

In February 2010, Plaintiff reported to Dr. Zachariah that she experienced one hour of stiffness in the morning but that she had no joint swelling. Dr. Zachariah noted that the musculoskeletal exam was normal, noting "slight fullness" but no synovitis.

On May 14, 2010, Dr. Zachariah submitted a "Lupus (SLE) Residual Functional Capacity Questionnaire" in which she stated that Plaintiff's lupus produced a malar rash over the cheeks; non-erosive arthritis affecting the hands, wrists, and knees; renal involvement; and a positive test for ANA. Dr. Zachariah checked the boxes for severe fatigue, poor sleep, and hair loss. Dr. Zachariah opined that Plaintiff's symptoms would "seldom" be severe enough to interfere with attention and concentration and that Plaintiff could tolerate moderate work stress. Dr. Zachariah indicated that Plaintiff's lupus was moderate to severe. Dr. Zachariah gave Plaintiff the following limitations. Plaintiff was able to sit for two hours at one time, stand and walk for more than two hours at one time, sit for a total of less than two hours in an eight hour day, and stand and walk for a total of four hours in an eight hour day. Plaintiff needed to take unscheduled breaks every four hours and needed to rest for four hours before returning to work. She could occasionally lift and carry less than ten pounds and could never lift and carry ten pounds or more. She could occasionally twist but could never stoop, crouch, or climb ladders or stairs. She needed to avoid even moderate exposure to extreme cold and concentrated exposure to extreme heat and high humidity. Her impairments were likely to produce both good and bad days and she was likely to miss two days of

work each month. Dr. Zachariah opined that Plaintiff did not have any significant limitations in doing repetitive reaching, handling, or fingering.

## B. Hearing Testimony and Reports Submitted to the Administration

Plaintiff testified that she had recently reduced the number of hours she worked each week to twelve because of full-body soreness and fatigue. The soreness and feelings of extreme fatigue began in 2009 and were accompanied by stiffness. She woke up feeling like "cardboard," unable to move her arms or to walk. (AR 46). She experienced flare-ups of stiffness which occurred when her joints swelled and her movement was further limited. Rheumatoid arthritis and lupus caused pain in the feet, knees, hips, wrists, and hands. Plaintiff testified that she was treated with Prednisone when a flare-up occurred but that her doctor gave her other medication because of the effect Prednisone could have on her liver and kidneys. Furthermore, Prednisone upset Plaintiff's stomach. Other medications that doctors prescribed to treat rheumatoid arthritis and lupus caused Plaintiff to feel dizzy and light-headed. No medication provided complete relief, as even with medication, Plaintiff experienced swelling and difficulty bending and climbing stairs. She suffered from back pain that sometimes interrupted her sleep every two to three hours. She described the pain as ranging from mild to severe, up to a ten on a ten-point scale. Her hands were afflicted with pain and swelling as a result of severe carpal tunnel syndrome and she had difficulty opening jars and boxes and picking up objects. Picking up objects caused swelling of the hands. Her hands swelled once each week on average and the swelling lasted for two days. At night she slept with braces on each hand. She suffered from constant fatigue that left her without energy to even walk up stairs. When she returned home after working a six-hour shift, she would, ". . . just lay[] in the bed." Plaintiff suffered from enlarged lymph nodes under the right arm that became inflamed every two months.

Inflammation, when it occurred, lasted for a week and caused stiffness that made moving her arm difficult.

Plaintiff awakened every morning with full-body stiffness; while stiffness in the legs abated somewhat after she walked around, she remained stiff in other parts of the body. She helped her twelve-year-old son get ready for school and then attempted light housework, though she relied on her husband and son for assistance. She did not lift heavy items at home. She was able to wash clothes in the washer and dryer but relied on her son to put the clothes away. She went to the grocery store once every week or two weeks and shopped for 30 minutes or less. She spent most of her time at home lying down resting. When at work, Plaintiff was able to remain on her feet for two to three hours before needing to take a 15 minute break. She could sit for no more than an hour before needing to move around to alleviate stiffness in the back. She relied on coworkers to lift any objects that weighed more than five pounds. Her hands swelled during the two days that she worked.

Plaintiff submitted an undated Adult Function Report to the Administration in which she stated that her impairments restricted her ability to lift, squat, bend, stand, walk, kneel, climb stairs, and use her hands. Plaintiff needed assistance carrying heavy objects when attempting housework and needed to sit intermittently when preparing a meal. Pain in the hands and difficulty standing limited Plaintiff's enjoyment of hobbies that included gardening and crocheting. She did not leave the house as much as she did before being afflicted with her impairments, as most of the time she was tired and needed to lie down. She became dizzy and light-headed after standing or walking short distances.

### C. Vocational Expert Testimony

The ALJ questioned the vocational expert ("VE") as to the availability of jobs to a hypothetical individual who retained the residual functional capacity ("RFC") to perform medium work and who had to avoid moderate exposure to extreme cold and concentrated exposure to extreme heat and high humidity. The VE testified that the hypothetical individual would have been unable to perform Plaintiff's past relevant work but was able to perform the jobs of labeler, office helper, or assembler. If the individual was limited to work that involved standing and walking for four hours in an eight hour day and sitting for less than two hours in an eight hour day, she would have been precluded from any competitive employment. If the individual was able to use the hands and wrists occasionally and not repetitively, she would have been unable to perform the jobs identified by the VE. If the individual could only work two or three days each week, missed more than two days of work each month, or was off-task more than 20 percent of the day, she would have been precluded from competitive employment.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [the claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski*

*v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's

RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal of the ALJ's decision, arguing that (1) the ALJ improperly evaluated Plaintiff's credibility; (2) the ALJ improperly weighed the opinion of Dr. Zachariah; and (3) the ALJ improperly assessed Plaintiff's residual functional capacity ("RFC"). The Commissioner contends that the ALJ considered the record under the appropriate regulatory framework and that substantial evidence supports his decision. The Court considers each argument in turn.

### A. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. In determining whether statements of symptoms contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective

medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id.*

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p requires the ALJ to consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* § 404.1529(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not

overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

As an initial matter, Plaintiff notes that the ALJ impermissibly employed the well-known "boilerplate" language at the outset of the credibility determination. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error if he "otherwise points to information that justifies [her] credibility determination." *Pepper*, 712 F.3d at 367-68. In this case, the use of "boilerplate" language alone does not require remand because the ALJ considered the required factors in assessing Plaintiff's credibility and analyzed the evidence to explain his credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). Nevertheless, several other errors in the ALJ's credibility determination require remand.

First, the Seventh Circuit Court of Appeals has criticized ALJs for relying on the claimant's ability to perform simple or basic daily activities in order to find a claimant not fully credible:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson*, 671 F.3d at 647 (citing *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 351-52 (7th Cir. 2010); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir.

2005); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005); *Kelley v. Callahan*, 133 F.3d 583, 588-89 (8th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996)).

In this case, the ALJ found that Plaintiff was "fairly active in spite of purported pain," (AR 28), noting that Plaintiff was able to drive, prepare meals, do laundry, do light housework, wash dishes, and shop for groceries. Yet, the ALJ did not explain how these minimal activities are inconsistent with severe pain or support a finding that Plaintiff could perform work at the medium exertional level, which includes being able to lift up to 50 pounds at a time over the course of an eight-hour day. Moreover, Plaintiff testified that when she does laundry, she relies on her son to put the clothes away. These minimal daily activities performed by Plaintiff, often with accommodations, are not inconsistent with Plaintiff's claims of pain, stiffness, and limitations. *See Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (finding that the performance of basic daily chores, which the claimant did in such a way as to minimize the weight she had to lift, was not consistent with the standard of performance required by an employer); *Gentle*, 430 F.3d at 867-68 (finding caring for two small children, cooking, cleaning, and shopping not to be inconsistent with a disability claim); *Zurawski*, 245 F.3d at 887 (finding that the claimant's activities of helping his children prepare for school, doing laundry, and cooking dinner were "not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (finding that performing household chores in a two-hour interval, cooking, shopping, vacuuming, and watching grandchildren were not inconsistent with disability, in part, because of the additional limitations in doing those basic activities); *see also* SSR 96-7p at *8 (indicating that an ALJ must consider that "daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms").

The ALJ also appears to equate Plaintiff's performance of part-time work with an ability to sustain full-time work; if this is the case, it was in error. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (criticizing the ALJ for not explaining how the claimant's brief, part-time employment supported the determination that she could maintain consistent full-time employment). Plaintiff testified that she worked two days a week for a total of twelve hours at a fast food job and that she worked six to eight hours a month selling candles. This schedule was the result of a reduction in hours at the fast food job over time from 24 to 30 hours per week, to 16 hours per week, to 12 hours per week beginning in January 2011 because she was unable to tolerate the pain and fatigue that accompanied full-time work. Plaintiff testified that working two days in a row caused swelling of the hands that lasted for several days and that she was able to stand for two to three hours before needing to take a break to sit down. The ALJ did not discuss this evidence. Moreover, Plaintiff testified that her work was performed at the light exertional level, not the medium exertional level of the RFC. In the context of evaluating Plaintiff's subjective complaints, the ALJ acknowledged that Plaintiff continued her sales and fast food work, even though on a reduced basis. It is not clear how the ALJ weighed this fact, but given that the ALJ found Plaintiff not credible to the extent of the RFC, it appears that the ALJ relied on the fact of Plaintiff's part-time work to find that she could perform full-time work. The lack of discussion of this element makes it impossible for the Court to trace the line of the ALJ's reasoning.

Next, the ALJ concluded that the intensity, frequency, and limiting effects of Plaintiff's symptoms were not as severe as alleged based on the ALJ's perception that Plaintiff did not comply

with treatment. The ALJ commented that Plaintiff sometimes forgot her nightly dose of Plaquenil, that she cancelled a Rituximab infusion, that she was off her medications for two weeks on one occasion, and that she refused stronger medication. The ALJ was correct in considering Plaintiff's compliance with treatment when evaluating credibility. However, before drawing any inferences from a failure to seek or pursue treatment, the ALJ must "first consider any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See* SSR 96-7p; *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

In this case, the ALJ did not obtain any explanation from Plaintiff at the hearing as to why she sometimes forgot her medication, why she cancelled the infusion, or why she did not want to take stronger medication. Nor did the ALJ discuss the record evidence that Plaintiff was hesitant to start taking Rituximab due to potential side effects and that nephrology had wanted to start steroids for her stage three glomerulonephritis but that Plaintiff declined. The ALJ did not establish that Plaintiff forgot to take her medication with sufficient regularity to undermine the severity of her allegations. Contrary to the Commissioner's suggestion, it was not enough for the ALJ to simply note the issues with Plaintiff's conduct regarding her medication without exploring the "why" behind the conduct. Again, the Court cannot follow the path of the ALJ's reasoning. Although the Commissioner points to evidence in the record that Dr. Zachariah repeatedly warned Plaintiff about the risk of damage to internal organs if she did not take certain medication, the ALJ did not discuss those warnings in his decision. On remand, the ALJ shall obtain explanations for the perceived noncompliance with treatment and include them in his discussion.

The ALJ also found Plaintiff's assertions regarding the limiting effects of stiffness and back pain to be exaggerated based on the level of treatment Plaintiff received. First, the ALJ acknowledged Plaintiff's testimony that after work she cannot move and must lie down, that she has constant back pain if she lies or sits, that she suffered constant tiredness in 2009, and that she is tired and fatigued all the time and lies down frequently during the day. He contrasted the testimony with a lack of support in the record, commenting that Plaintiff underwent no hospitalization, had no emergency room visits, did not use rehabilitation therapies, and did not ambulate using an assistive device. Again, the ALJ was correct to consider the type of treatment Plaintiff received but erred in the evaluation of the treatment. *See* SSR 96-7p. There is no evidence of record nor does the ALJ cite any medical authority that these alternative treatments and therapies were indicated for Plaintiff's conditions. On remand, should the ALJ again find that the level of treatment does not support Plaintiff's alleged limitations, the ALJ shall properly support the finding.

If the ALJ had made any one of these errors in isolation, the overall credibility determination may have been sustained. However, the combination of errors in several of the factors that must be considered in a credibility determination renders the Court unable to say that the decision was not patently wrong. Remand is required for a proper credibility determination.

### B. Weight to Treating Physician Opinion and State Agency Physician Opinion

An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503.

In this case, the ALJ gave significant weight to Dr. Zachariah's opinions on the lupus RFC form that Plaintiff should avoid even moderate exposure to extreme cold and concentrated exposure

to extreme heat and high humidity and that Plaintiff's impairments would seldom interfere with her attention and concentration. The ALJ found these opinions to be supported by the record.

In contrast, the ALJ gave little weight to Dr. Zachariah's favorable opinions, given in the same document, that Plaintiff was able to sit for less than two hours in an eight-hour workday, was able to stand and walk for a total of four hours in an eight-hour workday, needed to take a break every four hours before returning to work, was able to occasionally lift and carry less than ten pounds and was unable to lift more than ten pounds, and could occasionally twist and never stoop, crouch, or climb ladders or stairs. The ALJ gave these opinions little weight because they were "not well supported by the medical records." (AR 29). Specifically, the ALJ noted that objective examinations during the period at issue were generally normal and that Dr. Zachariah appeared to be basing her opinions solely on Plaintiff's complaints. The ALJ also found that there were "no documented complaints of pain during the numerous visits during the period in issue." (AR 29).

Plaintiff argues that the ALJ erred by rejecting portions of Dr. Zachariah's opinion without using the "checklist of factors" set out in 20 C.F.R. § 404.1527(c), including the treatment relationship, Dr. Zachariah's specialty, and the limitations reflected in the medical records from Dr. Zachariah. Overall, the ALJ identified the portions of the opinion to which he gave little weight and explained why. Unlike many cited by Plaintiff, this is not a case in which the ALJ selectively discussed portions of a physician's report that support a finding of non-disability while completely ignoring other portions that suggest disability. *See Campbell*, 627 F.3d at 306 (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). Nor is this a case in which the ALJ completely ignored the checklist of factors. *See id*. at 308 (citing *Larson*, 615 F.3d at 749 (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer v. Astrue,* 532 F.3d 606,

608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play")).

And, for the most part, the ALJ examined the record evidence to explain why he gave less weight to the limitations imposed by Dr. Zachariah. The ALJ identified the specific time periods of the records, noted the largely normal physical examination results, and discussed the mostly normal diagnostic findings and objective medical evidence. The ALJ noted that Plaintiff consistently had normal range of motion in all of her joints, including her upper extremities, rare documentation of synovitis in some of her finger joints, no apparent reports of swelling, including those in her upper extremities, and normal neurological examinations, including normal sensation. The ALJ also noted that Plaintiff did not complain of pain during any of her office visits and identified those visits where Plaintiff reported feeling fine, denied fatigue, or denied other lupus symptoms.

Nevertheless, as discussed in the following paragraphs, the ALJ ignored two major factors–the nature and history of the treatment relationship and Dr. Zachariah's specialty–and did not address favorable medical evidence regarding Plaintiff's sinovitis and stage three glomerulonephritis. Given the importance of these factors in the overall balance of the weight given to Dr. Zachariah's opinion, remand is appropriate for a proper analysis.

First, Plaintiff suggests that the ALJ did not consider the length and nature of the treatment relationship. While the ALJ identified Dr. Zachariah as Plaintiff's treating physician and thoroughly discussed the treatment history in the pages preceding the credibility determination, the ALJ did not discuss this factor in the context of weighing the opinion. On remand, the ALJ shall explicitly discuss the nature and length of the treatment relationship in weighing Dr. Zachariah's opinion.

Second, Plaintiff argues that the ALJ did not recognize Dr. Zachariah's specialty as a rheumatologist. Although Dr. Zachariah's specialty is not readily apparent from either her treatment notes or opinion, the record demonstrates that Dr. Zachariah is a specialist. Plaintiff's primary care physician, Dr. Tallamraju noted that Plaintiff needed to be seen by a rheumatologist, and Dr. Zachariah indicated that Plaintiff had been referred by Dr. Tallamraju. On remand, the ALJ shall discuss the fact of Dr. Zachariah's specialty in weighing her opinion.

Third, Plaintiff argues that the ALJ erroneously rejected parts of Dr. Zachariah's opinion for lack of supporting evidence by ignoring two areas of limitation found by Dr. Zachariah that "were reflected in her medical records," namely her synovitis and stage three glomerulonephritis (Pl. Br. 10). Plaintiff notes that Dr. Zachariah's examination records reflect synovitis in the PIP joints and contends that, because synovitis causes pain and swelling of the affected joint, Dr. Zachariah could have reasonably concluded that Plaintiff should have lifted no more than ten pounds to mitigate pain. In his review of all of Plaintiff's medical records from Dr. Zachariah (many of which Plaintiff failed to include in her recitation of the medical facts in her brief), the ALJ specifically noted that the record contained "rare" document of synovitis in her finger joints. Yet, Dr. Zachariah observed sinovitis in the finger joints on three or four occasions; the ALJ does not explain why limitations are not appropriate based on these observations by Dr. Zachariah. While the sinovitis of the finger joints may not support the severe sitting and standing limitations, the ALJ does not explain why the sinovitis does not support the lifting limitation imposed by Dr. Zachariah in the lupus RFC.

As for the April 2010 diagnosis of stage three glomerulonephritis, Plaintiff notes that this condition can cause fatigue and joint pain and that she complained of both. However, in her opening brief, Plaintiff offers no citation to the record evidence for such complaints. In contrast, the ALJ

considered all the record evidence and found that Dr. Zachariah's treatment notes did not document complaints of pain. In her reply brief, Plaintiff notes her complaints of fatigue in May 2009 and August 2009 and her complaint of knee pain in July 2009. Given the length of her treatment, substantial evidence supports the ALJ's understanding of Plaintiff's complaints of pain and fatigue as minimal. Nevertheless, while the glomerulonephritis diagnosis predates Dr. Zachariah's May 2010 opinion by only a month, it appears that Dr. Zachariah considered that diagnosis in the lupus RFC because Dr. Zachariah checked the box for renal involvement and checked the box for "severe fatigue." On remand, the ALJ shall seek clarification regarding Dr. Zachariah's opinion as to Plaintiff's fatigue and symptoms based on the stage three glomerulonephritis.

The ALJ also found that Dr. Zachariah's opinion was based on Plaintiff's subjective complaints rather than objective evidence: "Objective examinations during the period in issue were generally normal, and it appears that the doctor was basing her opinions on complaints alone." (AR 29). This statement is not supported by substantial evidence of record as to all of Plaintiff's complaints, especially those of swelling. As set forth in the factual background above, Dr. Zachariah made objective physical findings and the diagnostic blood and urine testing supported Dr. Zachariah's diagnosis. Also, to the extent that some of Dr. Zachariah's lupus RFC opinion is in fact based on Plaintiff's subjective complaints of pain and/or fatigue, the weight the ALJ gave to Dr. Zachariah's opinion is affected by the errors in the ALJ's credibility determination set forth in the prior section. Thus, the remand for a proper credibility determination may influence the weight the ALJ gives to the portion of Dr. Zachariah's opinion based on Plaintiff's subjective complaints.

In weighing Dr. Zachariah's opinion, the ALJ did not have an alternative medical opinion that discredited Dr. Zachariah's, and the ALJ improperly weighed the opinions of the non-examining

state agency physicians. *See Gudgel*, 345 F.3d at 470 ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). In two sentences, with no analysis, the ALJ gave "considerable" weight to the opinion for medium work of the state agency doctors, Dr. Sands and Dr. Whitley, because "[t]heir opinion is well supported by the medical records." (AR 29). However, the opinion of Dr. Sands was given in December 2009. Plaintiff received over eighteen months of additional treatment between the date of Dr. Sands' assessment and the ALJ's decision, and none of those records were evaluated by Dr. Sands. *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010). It was improper for the ALJ to surmise that Dr. Sands would not necessarily have altered his assessment of Plaintiff had he reviewed the additional records, which included the diagnosis of enlarged right axilla lymph node and stage three glomerulonephritis. Nor does Dr. Whitley's March 16, 2010 affirmation of Dr. Sands' opinion cure the error because there is no evidence that Dr. Whitley considered the additional evidence and impairments other than the check mark next to the preprinted statement: "I have reviewed all the evidence in file and the assessment of 12/07/2009 is affirmed, as written." (AR 427). On remand, the ALJ shall obtain an updated consultative opinion.

Plaintiff's request for relief asks either for remand for a proper evaluation of Dr. Zachariah's opinion using the checklist factors, or, in the alternative, for a finding that Dr. Zachariah's opinion is entitled to great weight and award benefits. In this instance, remand for further proceedings is appropriate.

### C. Residual Functional Capacity

The residual functional capacity ("RFC"), which is at issue at steps four and five of the sequential evaluation, is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. The evidence relevant to the RFC determination includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, at *5. The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. The ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

Plaintiff argues that the ALJ erred in formulating her RFC by failing to include any limitations produced by Plaintiff's carpal tunnel syndrome, by failing to properly consider her obesity, and by failing to consider her impairments in combination. Overall, the ALJ's RFC decision is relatively thorough, providing a narrative discussion of the medical and nonmedical evidence and assessing Plaintiff's abilities in accordance with statutes and regulations. Nevertheless, remand is required because the ALJ did not create a logical bridge between the evidence and testimony regarding Plaintiff's carpal tunnel syndrome and the RFC. The Court considers each of Plaintiff's RFC arguments in turn.

First, the ALJ found that Plaintiff's bilateral carpal tunnel syndrome was a severe impairment at step two of the sequential analysis. However, the ALJ did not include any related limitations in the RFC. The objective medical evidence, namely the results of the April 2009 EMG of Plaintiff's wrists showing left and right severe mononeuropathy across the wrists, supports the diagnosis of bilateral carpal tunnel syndrome. Dr. Tallamraju prescribed carpal tunnel splints, which Plaintiff wore at night when she slept and any time her hands swelled. In May 2010, Dr. Zachariah observed swelling of Plaintiff's wrist and hand upon examination. Plaintiff testified that use of her hands caused swelling and that her hands swelled whenever she worked.

In his credibility determination, the ALJ discussed Plaintiff's hands, acknowledging Plaintiff's complaints of swelling. However, the ALJ then found that there was no swelling during the period at issue, contrary to the May 2010 evidence. Although the ALJ listed the April 2009 EMG in his summary of the medical record, he does not include the test results in analyzing the credibility of Plaintiff's stated limitations as a result of carpal tunnel syndrome. Nonsensically, the ALJ discredits Plaintiff simply because she misstated that Dr. Zachariah, rather than Dr. Tallamraju, prescribed the splints. Yet, the ALJ seems to ignore the fact that a treating doctor indeed prescribed the splints and that Plaintiff used the splints to relieve the associated symptoms. These errors cannot be overlooked and require reversal in light of the vocational expert's testimony that, if Plaintiff could only occasionally use her hands, Plaintiff would have been unable to perform the jobs identified by the vocational expert.

On remand, the ALJ shall properly discuss all of the evidence regarding Plaintiff's carpal tunnel syndrome, which the ALJ found to be a severe impairment, and explain what limitations result from the impairment. *See Myles*, 582 F.3d at 676-77 (finding that the ALJ failed to properly assess hand limitations after acknowledging the limitations but giving no reason for rejecting the

limitations); *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (finding that the ALJ erred in not properly evaluating a hand limitation). Also on remand, the ALJ shall explicitly discuss whether any limitations from Plaintiff's non-severe enlarged right axilla lymph node should be included in the RFC.

Second, Plaintiff argues that the ALJ failed to properly consider the effects of her obesity in formulating the RFC. The Court disagrees. The ALJ explicitly found that Plaintiff's obesity did not produce any limitations because no treating source identified any limitations. Plaintiff argues that the ALJ should have considered the effect of obesity in combination with Plaintiff's other impairments. Under Social Security Ruling 02-1p, Plaintiff's BMI of 38.1 is Level II obesity. *See* SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002) (citing the National Institutes of Health Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults). The Ruling clarifies that "[t]hese levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." *Id*. The consideration of obesity should be an integral factor underlying the construction of the RFC. *Id*. at *6. The ALJ must consider whether obesity causes any functional limitations and explain that conclusion: "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id*. at *6-7.

The Ruling provides some guidance on how obesity is factored into the RFC determination:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

*Id*. at *6. Consistent with Ruling 02-1p, the Seventh Circuit Court of Appeals requires that the ALJ "factor in obesity when determining the aggregate impact of an applicant's impairments." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (citing *Martinez*, 630 F.3d at 698-99; *Clifford*, 227 F.3d at 873); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding that the ALJ erred by not explaining the consideration given to the claimant's obesity).

Unlike cases in which the claimant's obesity is ignored, the ALJ in this case specifically addressed the effects of Plaintiff's obesity, finding "no further limitations resulting from obesity" and that "[n]one of the treating sources indicated as such." (AR 28). Moreover, the ALJ relied on the opinions of doctors who were aware of Plaintiff's obesity. *See Arnett*, 676 F.3d at 593 (citing *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504). Plaintiff identifies no evidence that supports greater functional limitations as a result of her obesity. Reversal is not required on this basis.

Finally, Plaintiff argues generally that the ALJ should have found that work at the sedentary level was appropriate for Plaintiff based on the combination of her impairments, namely her lupus, rheumatoid arthritis, nephritis, and obesity. However, the Court finds that, other than as to the errors identified above, the ALJ properly considered the limitations resulting from each of Plaintiff's impairments and Plaintiff does not identify any evidence of record suggesting that the combination of her impairments created additional or greater limitations. Nor does Plaintiff offer any evidentiary support for her conclusion that the ALJ should have concluded that walking and heavy lifting was impossible and that sedentary work was most appropriate for Plaintiff. Reversal is not required on this basis.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of her Motion to Reverse the Decision of the Commissioner of Social Security [DE 16], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 9th day of June, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record